TRYON *v.* PINGREE.[1]

1. FALSE IMPRISONMENT—WARRANT FAIR ON ITS FACE.
   An action for false imprisonment will not lie where the detention was by virtue of a warrant issued by a court having jurisdiction of the subject-matter, and regular on its face.

2. CRIMINAL LAW—OBSTRUCTING PUBLIC OFFICER.
   A combination of two or more persons for the purpose of obstructing the mayor of a city in the exercise of his right to examine, in his official capacity, the books of a city office, is indictable as a conspiracy at the common law.

3. MALICIOUS PROSECUTION—PUBLIC OFFICERS—EVIDENCE.
   Whether the mayor of a city was acting officially or in his private capacity in attempting to examine the books in a city office is a material inquiry in an action for malicious prosecution based upon the commencement by him of criminal proceedings for an alleged conspiracy to obstruct him in the exercise of his right, and evidence tending to show that he was merely seeking to aid a newspaper reporter in obtaining access to the records is relevant to this issue.

4. TRIAL—INSTRUCTIONS.
   The refusal of instructions which correctly state the law as to an issue which would not be material otherwise may constitute error if the court gives other instructions on that issue which may mislead the jury.

Error to Wayne; Frazer, J. Submitted October 7, 1896. Decided April 27, 1897.

Case by James E. Tryon against Hazen S. Pingree for false imprisonment and malicious prosecution. From a judgment for defendant, plaintiff brings error. Reversed.

*George Gartner* (*Fred C. Harvey* and *Fred A. Baker*, of counsel), for appellant.

[1] Rehearing denied June 18, 1897.

*Thomas T. Leete, Jr.,* and *Eli R. Sutton* (*C. A. Kent,* of counsel), for appellee.

MOORE, J. This is an action for malicious prosecution and false imprisonment. Verdict and judgment were given for defendant, and plaintiff brings the case into this court.

In August, 1894, the plaintiff was secretary of the board of fire commissioners of the city of Detroit, and had the custody of its books and papers. The defendant at this time was mayor of the city of Detroit. The act creating the board of fire commissioners provided: "The books and accounts kept by said board shall at all times be subject to the inspection of the mayor and controller." Mr. Greusel was employed by the Detroit Tribune, a leading paper of Detroit, to look up and prepare matter for publication pertaining to the fire department. An article was published which the commissioners claimed untruly reflected upon the management of the department, and they directed the secretary not to permit Mr. Greusel to examine any more of the books belonging to the department. Upon the refusal of Mr. Tryon to permit an examination of the books by Mr. Greusel, the managing editor of the Tribune wrote a letter to the mayor, stating the refusal by Mr. Tryon to allow Mr. Greusel to examine the books, and saying that they had information which led them to believe that serious irregularities existed in the management of the fire department, and asked the mayor to request Controller Moore to make an examination of the books in the presence of Mr. Greusel. It was also claimed by the mayor that he had received information of irregularities from other sources.

The mayor and the controller visited the office of the fire department, and found the assistant secretary in charge. He was informed by the mayor that he had come, as mayor, to examine the books. A few books and papers were examined, but those in the safe were not produced for his inspection. The next day the

mayor, accompanied by Mr. Greusel, visited the office, and found the plaintiff in charge. The mayor requested that Mr. Greusel be allowed to examine the books as his representative. This was refused. He then demanded to see the books himself, and was told that he could not do so until Mr. Goodfellow, president of the commission, was notified. Later in the day, Mr. Pingree, accompanied by his secretary, two policemen, and Mr. Greusel, again visited the office. Mr. Tryon was not there. The books were not produced for examination, and, after a delay of an hour, the mayor and his secretary left the office. Mr. Greusel remained, with written authority from the mayor to examine the books in his behalf.

After leaving the office, Mr. Pingree met Mr. Tryon and Mr. Goodfellow on their way to the fire department. Some conversation ensued. The mayor stated that he had left Mr. Greusel to examine the books. He was informed by Mr. Goodfellow that the commission was in charge of that office, and that he would go down and throw Greusel out; and the defendant stated he would go along and see him thrown out. A whispered conversation occurred between Mr. Tryon and Mr. Goodfellow, and Mr. Tryon went on ahead of the others. When Mr. Pingree and Mr. Goodfellow reached the offices, they were closed, and the doors locked. A controversy arose. A number of firemen were called by Mr. Goodfellow to eject Mr. Greusel. Mr. Pingree attempted to protect him. Then Mr. Elliott and others seized and held Mr. Pingree, and Mr. Greusel was thrown downstairs. Mr. Pingree remained for a time, and demanded to see the books. His demand was refused. About 6 o'clock of the same day, Mr. Pingree, with his secretary, Mr. McLeod, and several policemen, again visited the offices of the fire department, and demanded to see the books. His demand was refused, upon the ground that it was after office hours. On the evening of the same day, Mr. Pingree summoned to his office Mr. Flowers, a lawyer, Police Justice Sellers, John G. Hawley, a lawyer, and others.

It is claimed by the defendant that he fully and fairly stated all of the facts of which he was advised to Mr. Hawley, his lawyer, and that he was advised by Mr. Hawley that the plaintiff and Mr. Goodfellow, Mr. Elliott, and other persons were guilty of a conspiracy. Mr. Hawley dictated a complaint charging conspiracy, in the presence of both of the police justices. The complaint was sworn to by Mr. Pingree. Police Justice Sellers issued a warrant. It is claimed that this ended his connection with the criminal case. On the part of the plaintiff it is claimed that, at the examination, he was represented by private counsel, and that he instigated the arrest and the subsequent prosecution of the case. Mr. Tryon was arrested, gave bail, and at the examination, after the witnesses were sworn, upon advice of the prosecuting attorney, was discharged. He then brought this suit, with the result already stated.

A good many questions are raised by the record and briefs. It is admitted that the mayor had the right to examine the books in his official capacity; but it is claimed by the plaintiff that, in all he did, he was not acting as mayor, but was seeking to help Mr. Greusel personally, and was actuated by improper motives. It is also claimed by the plaintiff that the mayor could not delegate his right to examine the books to Mr. Greusel. It is urged that Mr. Pingree did not fully and fairly state all the facts he knew to Mr. Hawley. It is contended that to obstruct an executive officer is not a crime, either at common law or by statute, and that the complaint which was made did not charge an offense. A large number of assignments of error were taken. These have all had careful consideration; but it will not be necessary, in our view of the case, to discuss all of them.

The charge of the trial judge, so far as it is necessary to quote it, was as follows:

"I give you defendant's sixth request, as modified: 'That, the warrant having been issued by a court having jurisdiction of the preliminary examination of all offend-

ers or offenses committed in Detroit, the judgment of the court that there is such a crime as the one charged, and that there was reason to think the persons charged had committed it, protects all persons concerned in the issue or execution of the warrant, as far as false imprisonment is concerned.' I charge you that it is the law of this case that there can be no recovery as against the defendant on the count in this declaration for false imprisonment. I understand it to be the law as laid down in *Wheaton* v. *Beecher*, 49 Mich. 348, that, when the offense stated in the warrant is such an offense that the justice has jurisdiction of the subject-matter, the warrant will protect the officer serving it, and also all parties making the complaint. I charge you that in this case the justice did have jurisdiction of the subject-matter for which this warrant was issued, and that, having jurisdiction of the subject-matter, there can be no recovery in this case upon any ground of false imprisonment. The question that I shall leave to you is simply one question for you to determine, or two questions, rather, and that is upon the count in this declaration charging the defendant with malicious prosecution. Indeed, in order to sustain an action for malicious prosecution, it is necessary that two things should be proven: *First*, that there should be malice,—and, in a case of malicious prosecution, I understand malice to be an intentional wrongdoing. This malice may be inferred from want of probable cause; that is, if there was no probable cause for the issuing of the warrant, then a jury may infer from that a malice such as is required by law. But, gentlemen of the jury, want of probable cause is to be inferred or to be proven or established before you in this case on these premises: I charge you that if the defendant in this case, Mr. Pingree, fully, fairly, and honestly stated the facts as they appeared to him, and as he knew them, to John G. Hawley, or to the police magistrate, and that, upon such a statement, this warrant was issued, then there can be no recovery in this case for malicious prosecution, even if the advice of John G. Hawley was wrong, or the warrant was issued without authority of law, or the warrant did not state any offense against the law. The principle which governs in this case is laid down by the Supreme Court of the State, and is as follows: 'Every man of common information is presumed to know that it is not safe in matters of importance to trust to the legal opinion of any

but recognized lawyers. When a person resorts to the best means in his power for information, it will be such proof of honesty as would disprove malice, and operate as a defense proportionate to his diligence.' And in *Perry v. Sulier,* 92 Mich. 75, it is said that 'the person seeking and receiving such advice is, in law and in morals, justified in acting upon it, provided that he fully and fairly states the facts to the attorney.' Now, that is the question for you to decide, and the sole question involved in this case for your determination. And this language also has been used by the Supreme Court, which covers the law in this case which I think it necessary to submit to your consideration, and the rule fully stated, that, if a prosecutor has fairly submitted to his counsel all the facts that he knows, capable of proof, and he has acted *bona fide* on the advice given, he negatives the want of probable cause, and is not liable in an action of malicious prosecution. * * * If you shall find that the statement made by Mayor Pingree or Mr. Pingree, of the facts as they were shown to him, and as he knew them, and of all the facts, was fairly stated to John G. Hawley, and the warrant obtained after that statement, then the defendant in this case is not . liable for any damages; but if you shall find the facts were not fairly stated, that he was actuated by malice, that he did not conduct himself in a *bona fide* way, or did not come up to any of the principles laid down in the law as I have stated it to you, then the plaintiff would be entitled to recover such damages as you shall see fit to give him under the rule that I have already laid down in giving the requests of the plaintiff on the subject of damages, which is needless for me here to repeat."

We must assume that the provision of the charter of Detroit (chapter 16, § 24), authorizing the mayor to examine the books of the fire commissioners at all times, was designed to promote the public interest, by securing honesty and accuracy in the management of the affairs of the department under the control of the fire commissioners. Any obstacle that should be unlawfully interposed to prevent such an examination for a proper purpose would be an obstruction of the functions of government, and indictable as such at the common law. It is said that the offense of obstruction of officers is confined to court officers, bailiffs, etc., and does not extend to officers who

have to do with executive duties, as contradistinguished from those having judicial functions, and those who are charged with the enforcement of judicial mandates, conservators of the peace, etc., and that no case can be found where one has been convicted for such an offense. This does not necessarily imply that acts constituting an obstruction of government are not indictable at common law, and we should be reluctant to hold that acts of trespass, not otherwise criminal, would not become criminal if the object and effect were to prevent the governor, or legislators, or other State officers from performing the duties pertaining to their respective departments. We cannot think that the mother country, which punishes seditious libels and slanders, would have tolerated acts which actually interrupted official action; and it is possible that the English law would justify the conclusion that such an act would be punishable as a contempt against the king's prerogative, by fine and imprisonment, at the discretion of the king's court of justice. 4 Bl. Comm. 122. Mr. Bishop, in dealing with the question, has no apparent hesitancy in saying that the obstruction of governmental functions is criminal, where the act is of sufficient magnitude to deserve notice. 1 Bish. New Cr. Law, § 457. He says (section 480) that "of natures akin to treason, yet of inferior rank, are the various obstructions of the governmental machinery. The leading ones have been particularized in this chapter, but all other obstructions of the like sort and magnitude are also common law offenses." It is fair to say that he adds: "Practically, the law of this chapter is greatly circumscribed by the rule that it does not notice small things." Just where the line is which marks the limit of crime, and separates it from the realm of "small things which the law does not punish," is hard to say; but we are impressed with the gravity of an act which prevents executive officers of the nation, State, or cities from performing the duties of their offices.

If it be a fact that it was suspected that irregularities

existed in the management and use of the funds of the fire department of Detroit, the public was interested in knowing the truth, and had the right, through its mayor, to ascertain it; and, if interested parties were able to prevent it, with impunity, there would be no means of protecting the government in its rights except the slow process and uncertain efficiency of civil proceedings. Whether the charge was well or ill founded is another question. The warrant was sufficient to charge a most flagrant case, and being, in our opinion, good upon its face, the plaintiff's remedy then, if he had been wronged, was confined to an action for malicious arrest or prosecution, and the trial court did not err in directing a verdict for the defendant upon the count for false imprisonment.

While we are convinced that obstruction of the performance of an official duty is an offense at common law, we understand that the inquiry may always be made in a court of justice whether the obstruction is of an official or a private act. If the latter, it cannot be said that it is an obstruction of, or interference with, governmental functions. Hence evidence tending to show the defendant's object should not have been excluded. 2 Bish. New Cr. Law, § 1010, and cases cited.

It was claimed in this case that the circumstances showed that Mr. Greusel, a reporter of a daily paper, desired an opportunity to examine the books, for the purpose of making public such facts pertaining to the department as might be thought of interest to the public; that, being refused the opportunity, he invoked the aid of the defendant, who was willing to aid him, by means of his official privileges; and that it was for this purpose only, and not for any purpose connected with his office, that he made the demand; and that this question should have been submitted to the jury. It was no part of the official duty of Mr. Pingree to aid individuals in obtaining their rights, if they had any, as to the examination of books. It was within his province to investigate those books, and give the public information concerning the

condition of affairs, if he thought best. We have no right to determine this question unless we can say that the undisputed evidence shows one thing or the other; and as, in our opinion, it does not, it was for the jury to determine, from all of the circumstances shown.

Counsel for the plaintiff requested the court to charge the jury that—

"If, therefore, the defendant demanded the right to inspect otherwise than in his official capacity and for official purposes, then any refusal on the part of the commission or its agents would not constitute the offense of obstructing, hindering, and preventing a public official in the discharge of his duty."

And again:

"If the defendant, in going to the office of the fire commission, did not go in good faith and for official purposes solely, but for the purpose of helping out Greusel and aid the Tribune in getting up a story, then you are instructed that there was no probable cause in instituting the prosecution, and the advice of counsel is no defense to his action.

"In determining the question of malice, the jury are at liberty to infer malice from the want of probable cause, and they may also take into consideration what the real purpose of defendant was in going to the office of the fire commission, whether for official or for other purposes."

And again:

"The defendant had no right to use his official power to secure an investigation of the books and records of the fire commission by Greusel for the Detroit Tribune, that newspaper and Greusel having a right to seek such remedies in the courts as they were in law entitled to."

And again:

"The defendant had no right to delegate his power as mayor to investigate the books and records of the fire commission to Greusel, or to any other private party."

These requests show clearly enough the claim that was made on behalf of the plaintiff, and he was entitled to have it presented, unless the case was submitted in such

a way as to make it unnecessary. But it was not presented, and, instead, the court said:

"I charge you also that it is the law of this case that the mayor had the right to examine the books of the fire commission; that this right is conferred upon him by the charter of this city; and it is contended that Mr. Greusel, taken down there by the mayor, under the circumstances related by these witnesses, was not included in this privilege, or this permission, or this right which is conferred upon the mayor by the charter of this city. I was of that opinion when the law of this case was argued to me by counsel, but since then a decision of the Supreme Court has been called to my attention, which changes my opinion on this question; and, on the authority of *Burton* v. *Tuite*, 78 Mich. 363, I charge you that it is the law of this case that Mayor Pingree had the right to take down with him, for the purpose of conducting the examination of the books of the fire commission, Mr. Greusel, or any other person that suited his convenience to conduct this examination. I think, under the authority of that decision, this record is a public record, entitled and open to inspection, and that, under the facts in this case, the mayor of this city was justified in taking some person that he saw fit for the purpose of making an examination of the records of this office."

It having been shown that the defendant caused the criminal action to be commenced, and that it was terminated by the discharge of the defendant therein (the plaintiff here), it became material to inquire whether the commencement of the prosecution was malicious or not. And if it was shown that the defendant made a full, fair statement of the facts in the case to counsel, and was advised that they constituted an offense, and believing and relying upon such advice, and in the guilt of the plaintiff, commenced the proceeding, the defendant cannot be said to have maliciously prosecuted the plaintiff. If, as counsel for the defendant contend, it was proper for the case to go to the jury upon these two questions *alone* (which questions the charge shows were submitted to the jury), there was no necessity to give the requests above quoted, because the advice of counsel and defendant's good

faith would be a complete defense, whether the advice were
good or not, and defendant could not be found guilty, al-
though he should be mistaken and misinformed as to his
right to aid Greusel in his endeavor to see the books, and
it became unnecessary for the jury to inquire whether
Greusel had the right to see these books for his own pur-
poses, or to trouble themselves with the question whether
Mr. Pingree was there officially or not, because, as
already stated, the advice of counsel and good faith of
defendant were an ample shield, and conclusive of the
case.   But the judge did not stop with his instructions
upon these questions.   He proceeded to discuss the rights
of Greusel and the authority of the mayor in a way that
would naturally lead the jury to infer that the defendant
did not transcend the bounds of his authority, and, con-
sequently, that the defendant did not need the advice of
counsel to justify his complaint, and that they might find .
probable cause from those facts, and acquit the defendant,
although not satisfied that he had made a full and com-
plete statement to counsel, or acted upon such advice.
In doing this, the court refused to instruct the jury in
accordance with the requests, some of which were correct
statements of the law, and important to be laid before
the jury if they were going into the question mentioned,
even if the plaintiff had not a right to have that question
presented, and which it is evident that plaintiff's counsel
sought to have presented.   The situation would not be
improved by saying that the court did not submit the
case upon the two questions alone, and that the question
raised by the plaintiff's requests was left to the jury.   In
either case the court permitted the jury to infer that, if
the defendant went there solely to aid Greusel in securing
his alleged rights, it was an official act, and they would
be likely to understand (1) that the mere refusal to per-
mit an inspection of the books would amount to a justifi-
cation for issuing the warrant, without regard to the
other elements essential to a criminal conspiracy; (2)
that, if the purpose of the defendant was merely to en-

able Greusel to obtain access to the books for his personal purposes, the refusal constituted an offense.

The judgment of the circuit court is reversed, and a new trial ordered.

The other Justices concurred.